I'm Judge Gould. I'm presiding today and delighted to be here with my colleagues Judge Smith on my right and Judge Collins on my left. This case is set for 30 minutes per argument. And the case is Bradford v. Broomfield and it's number 23-99005. If an appellant wants to make a rebuttal argument, please try to not use yours for 30 minutes up and save some for rebuttal. Take that away. Okay, well, appellant could please proceed. Good afternoon, your honors. Supervising Deputy Attorney General Dan Hamadadi for the state. Can you speak up a little bit? Yes. Thank you. Yes, I can. I'd like to reserve five minutes for rebuttal, please. May it please the court. I will. If you forget, I'll try to help you out. But it's really up to you. Thank you, Judge Gould. Mark Allen Bradford was eligible for the death penalty because the jury believed Bradford's own words. That after he brutally beat and raped Linnea Cokes, rendering her incapacitated, he returned to Cokes' apartment to kill her in order to eliminate her as a witness against him. The evidence of his premeditation and deliberation was undeniable. After Bradford brutalized Cokes and her apartment, he returned to his so that he could shower her blood off of him. While there, he started thinking about Cokes. He did not want to get caught for his savage assault on her. When Detective Arnold asked him, so what were you going to do? Bradford responded, go down there and make sure she was dead. And that's exactly what Bradford did. He armed himself with a knife from his kitchen before he returned to Cokes' apartment, where he found her on the floor on her side gasping for air. He then rolled Cokes over, strangled her with a belt, slashed her throat twice and stabbed her four times in the heart. In Bradford's own words, he figured she ought to be dead after all that. Now, no one disputes that Bradford was drinking on the day that he killed Cokes. But Bradford's unequivocal and detailed confession came almost a day after he murdered her. And because Bradford's confession left no doubt he intended to kill Cokes, Bradford cannot show either Brady materiality or Strickland prejudice related to any allegedly suppressed BAC report. Threshold question about what framework we use, because we have first the issue of Coleman prejudice, which was the issue that the prior panel remanded. And that would be one prejudice analysis. And then we have the elements of prejudice from the merits of the Strickland claim and then materiality issues from Brady that sort of bleed into similar sort of prejudice issues. And those would be reviewed deferentially under AEDPA. That's correct, Your Honor. So my threshold question for you is, do we have discretion, assuming just arguendo, that we were to agree that no prejudice could be shown under an AEDPA deferential analysis? Can we skip over the Coleman prejudice analysis and say we need not decide that because skipping to the merits, we would deny it on the merits under AEDPA and we don't have to reach that because it's not jurisdictional? Or what is your view on that question? So, Your Honor, we believe under either the Coleman prejudice or the deferential standard that prejudice can't be shown under either standard. However, the easiest way for this court to decide this case is to simply go on to the merits of the claim and decide it under AEDPA deference. And that would just assume that Bradford could show prejudice under Coleman. However, as we briefed it, he cannot. But you agree that under Coleman, we would not apply an AEDPA deference type issue. So the prejudice would essentially be a de novo review? That's correct, Your Honor. So it would be de novo prejudice when you were looking at the... But the merits of the prejudice question, whether it's viewed de novo under Coleman prejudice or under AEDPA, is substantively the same. It's just that the standard of review would be different in the two contexts. Exactly. It would just simply be whether this court is required to apply AEDPA deference or not. So it would be similar to how, I mean, the statute expressly says we can skip over exhaustion and go to the merits.  And it would be similar to that in your view. Correct, Your Honor. And that's because here the California Supreme Court not only imposed a procedural bar, but decided the merits of the claims at issue here and denied them on the merits anyway. And so as... We have the right under Lambricks v. Singletary to go directly to the merits, do we not? That's correct, Your Honor. And so, yes, so even assuming the existence of a favorable BAC report in this case, there's no reasonable probability Bradford would have received a more favorable result. And that's because the evidence of his premeditation and deliberation came from his own mouth. And not only that, it was corroborated by the overwhelming physical evidence. For example, Bradford, before returning to Koch's apartment, armed himself with a knife. And then when he got to her apartment, he employed three different methods of killing her. He strangled her, he slashed her throat, and he stabbed her repeatedly four times in the chest, to be exact. Isn't there a case law that says that strangulation is per se premeditated? That's correct, Your Honor. As we cited in our briefing, I believe it was the Hernandez case. And I don't want to misspeak. I can't remember off the top of my head if there was strangulation in Crittenden as well. But it was, yes, I believe it was Crittenden was just the multiple stabbing and blunt force trauma. So it was different, multiple methods of killing. And so just going back to Judge Collins' question, the easiest way for this court to decide this case is to hold that the California Supreme Court could have reasonably denied the claims at issue here because no additional evidence of either intoxication or a diminished actuality defense at the guilt phase could have negated Bradford's intent to kill Kochs. Let me ask you this. I have a lot of respect for the judge. He's a fine judge. But it seemed to me that he got it backwards. He was doing a de novo review as if he were the original trier of fact rather than applying epidefference. And under epidefference, the question is whether the California Supreme Court could have found reasonably each of these elements that we're talking about. Is that correct? That's correct, Your Honor. And there were a lot of glaring errors in the district court's order. The one glaring omission here that's fatal to all of it is that the district court disregarded the import of Bradford's confession. And the district court was required to evaluate the import of Bradford's confession. Do we look at just the fourth? Yes, Your Honor. We look at the confession, the fourth confession, which was admitted into evidence. And I believe that the court can look to the statements that Bradford made previously to determine how intoxicated he was. But when we're evaluating the prejudice here at trial that could have possibly stemmed from this allegedly suppressed BAC report, which there is no evidence whatsoever that establishes a BAC report was ever completed. Well, I mean, it does say that the sample was drawn and put into a vial with the solution that you would use for toxicology testing. Isn't that correct? That's correct, Your Honor. However, we know that this blood drawn at the time of Mr. Bradford's booking was sent to serology. And serological testing was conducted on that vial of blood. And the results of that serological testing were discussed at the preliminary hearing. Mr. Bradford's counsel extensively cross-examined the criminalist who testified about the blood type. And there were many technical terms that Mr. Bradford's counsel used. So he clearly was... No indication in the record that any checking was done other than for blood type? That's correct, Your Honor. So all we know, this is a very sparse record. And all we know is that Mr. Bradford's blood was drawn at the time of booking. That was one vial of blood. It was sent to serology. That vial of blood was subjected to serological testing. The results of that serological testing were disclosed to Mr. Bradford's counsel. Testimony regarding that serological testing came out at the preliminary hearing as well as at the trial. And then we have this very ambiguous statement from the prosecutor about a year after the preliminary hearing when she requested more blood for further genetic testing, in her own words, regarding... And let me just back up here. This was prior to the trial court ruling on whether the confessions would come in. And so the prosecutor was requesting more blood to conduct DNA testing. And she makes this very ambiguous statement about they were told to use a purple cap instead of the gray cap that would be used. There's no further explanation about the import of that statement, what the different colored caps meant, whether, in fact, the cap used on the blood draw at booking had a gray cap, and what the prosecutor actually meant by this. It's just ambiguous. And because of the evidence that is apparent from the record, that this vial of blood, one vial of blood was drawn at booking, and it was subjected to serological testing. The physical evidence bulletin says that the gray stopper goes with the potassium oxalate sodium, you know, substance. And the record of the draw says that it was put into a solution of potassium oxalate and sodium fluoride. So isn't the natural reading of the comment that they were told to use a purple cap instead of a gray cap tube mean that they did, in fact, use a gray cap tube and had the right solution for a toxicology test, and then the record stops? The short answer, Your Honor, is we don't know. That could be one way of reading it. We just simply don't know. There's too many gaps in the evidentiary record here. And, of course, the absence of evidence doesn't mean that a petitioner has met his burden to establish that he's entitled to claim on a relief here. So, of course, that bulletin is from approximately nine years after Mr. Bradford's blood was drawn in this case. The form that indicated the blood draw had this preprinted information on it about the type of solution that was used. I'm not disputing that that was the solution that was used. I'm just saying we simply don't know. Is it fair to say that whichever solution was used, there is no evidence showing that the prosecution intentionally failed to deliver that information to the defense? Is that correct? That's correct, Your Honor. That's correct. And what I think about, too, is under any scenario, 13 hours had passed since the beginning of this process until the blood sample was taken. Almost anybody that's ever had a drink knows that alcohol dissipates during that time. And whichever the sample was, you get this expert that testified about the probability of what might have been there. There were three different samples or, if you will, estimates he did. All of them would have been fatal. The least was four-something, but that would have been fatal. But it's all speculation. There's nothing more than speculation. And I guess what I struggle with is, you know, when you have a normal Brady claim, the prosecution knows perfectly well that something is helpful to the defense and they intentionally don't disclose it. And I'm not seeing that in this record. Am I missing something? You're not missing anything, Your Honor. Here, there simply is no evidence that the prosecution subjected this vial of blood that was drawn some 13 to 14 hours after the offense's issue here was ever subjected to toxicological testing and, more specifically, whether a blood alcohol content testing was completed and a report was run. And furthermore, as you've identified, Judge Smith, there has been no competent evidence that that blood sample would have had any kind of measurable alcohol in it to do this extrapolation. Well, let me stop you there, because given the witness testimony about the volume of alcohol he consumed in the period from 10 a.m. to 4.30, the expert was able to say, you know, given the rate of dissipation from the body, that it would likely still have had a substantial amount left. Isn't that a reasonable inference that it's not that much alcohol isn't going to discharge in 13 hours from the system? So, Your Honor, it's true that Dr. Koda conducted three different extrapolations based on three different amounts of alcohol that Mr. Bradford may have consumed at the time of the offenses on the day of the offenses. However, Dr. Koda never declares that he believed that the blood would have contained a measurable amount of alcohol. His declaration says, if, if it contained a measurable amount of alcohol, then I would have been able to conduct this extrapolation to a reasonable degree of medical certainty. He doesn't say he doesn't declare that it's possible that it had it or that it definitively would. It's all speculative. Putting that all aside, Your Honors, even if, assuming the existence of a BAC report, that that BAC report would have been favorable to Mr. Bradford, that would have showed that his blood alcohol content was 0.497. Even assuming that, the evidence here of his premeditation and deliberation is still undeniable. Proving intoxication is just the first step. It's not the end of the inquiry. And I believe the district court was under the misapprehension that intoxication is the end of the inquiry. I want to go back to the question we just were talking, talking about, because what the declaration says, you know, it goes through each of the models and the, you know, the most favorable one in the sense that it's the one that's within the realm of plausibility is the 0.497. And he says that at 630 a.m., that would have been a 0.227 at the same rate. And so, therefore, that is a clear basis for saying that at the time of the draw, which was shortly after 630 a.m., that it would have had a measurable amount and that he then could have done the extrapolation. So I just don't see why it's speculative to say that at 630 a.m. there would have been enough to estimate the alcohol at the time of the murder. I understand, Your Honor. I'm not disputing that Dr. Koda conducted these extrapolations based on these three different scenarios. But if you look at the last paragraph of his declaration, it says, had that blood sample been tested and contained even a minimal measurable quantity of alcohol, a serum alcohol level at the time of the offense could have been estimated with a reasonable degree of reliability using pharmacokinetic calculations. So I think that it's still far too speculative. Dr. Koda. Well, of course, he's saying he doesn't know exactly what it is, but he's saying this is the amount of alcohol that goes in his system. This is how it dissipates. And these are the rates at which it dissipates. And at 630 a.m. under all these scenarios, here's what he would have had. And and if it had been measurable, I would have been able to say. But he's also provided the basis for saying why it is measured. And it's not speculative. It's it's hypothetical. It's circumstantial. But it is not. It's a reason line of argument you can follow. I understand, Your Honor. I don't want to belabor the point. And I notwithstanding Dr. Koda's estimates here, he did give three different ones. And, you know, both Mr. Bradford and the district court relied on the most favorable one, which is still. Is it agreed that does everyone agree? Was it disputed that the other two are impossible because they would even for the heaviest drinkers would have resulted in fatality? I think that the district court said that that's a near fatal amount. And even point four nine seven is is would be considered a medical emergency. Even if you take what my colleague says, though, as I read the record, Mr. Cohen brought the issue of intoxication and premeditation to the jury and said intoxication could have affected his ability to premeditate and deliberate. And if you concluded that it could only convict for second degree murder. So this is not a hypothetical that never got into the trial. The jury was presented with evidence about intoxication. Now, how much we've talked about that. But the reality is the concept of the defendant being intoxicated was clearly presented to the jury. The jury was clearly told that premeditation was necessary for first degree murder. They could find second degree murder and they didn't do that. So what do we do with that? How does that affect our analysis? So, Your Honor. Yes, the jury was presented with evidence of intoxication. And as as I've said, the easiest way for this court to decide this case is that even assuming this, there was some sort of BAC report, some scientific concrete evidence of his intoxication was presented at trial. There could have been dueling experts saying there's no way that is. I apologize. There could have been testimony rebutting that that he or argument by the district attorney that even with this blood alcohol level, he was able to intentionally do the acts that resulted in Miss Cox's murder here. As Mr. Radford said in his own words, he thought about it. He had a motive for this killing. He was thinking about Miss Cox and thought to himself, what if she lives and identifies me for this rape that I've just committed against her? And so before he returned to her apartment, he armed himself with a knife and he saw her there. She was still alive and he made sure she was dead in his own words and used those three different ways of killing her. And faced with that evidence, the jury would have had to disregard Mr. Bradford's own words, disregard the evidence in this case and look to the evidence of intoxication and say, well, he had a blood alcohol content of whatever it may be. And that means his intent was negated. But as as I've previously stated, intoxication, showing intoxication is just the first step. And the jury instruction talks about that. It says, if you believe that the defendant is intoxicated, then you must consider that and whether that intoxication negated the intent or four or prevented him from forming that intent. And there's ample evidence of premeditation deliberation in this case, as I've already talked about. I mentioned a case earlier about strangulation and that being per se premeditation. How does that factor in with the intoxication issue? So is that overrided? Is it a presumption? What is it? So as as court found in Hernandez versus Chapel, which was a de novo case, there was no difference in that case. The fact that the defendant strangled his victims, that there was bruising around the neck shows that that the killing was intentional. It wasn't a heat of passion. It was deliberate and and premeditated. And there's another case. Oh, it's clear. Claiborne versus Lewis as well, I believe, is a non ad hoc case where this court reviewed de novo. It was there was strangulation in there and in that case as well. And and so all of that evidence and aside from the strangulation and the methods of killing Mr. Bradford had a lucid recollection of the the two separate times that he was in Miss Cox's apartment. The first time when he raped, beat and sodomized her. And the second time when he went back and killed her and what he did, he remembered where items were in her apartment. He had the wherewithal to take some items with him. He had the presence of mind to lock the door behind him. He remembers all of these key details, what she was wearing, the order of his assault on her. And so all of that combines to undermine the district court's finding of prejudice in this case. And clearly, a fair minded jurist could look at the enormity, the enormous amount of this evidence of premeditation, deliberation and faced with that evidence, there is no reasonable probability. Mr. Bradford would have received a more favorable result had this BAC report been introduced or relatedly, a diminished actuality defense have been presented by by Mr. Bradford's defense counsel. Ask you a separate question. We've been mainly talking about claims for an eight. But do you agree that claims eight C through G and 13 through 29 need to be remanded for reconsideration? It's also the penalty phase, right? Yes, Your Honor. So part of our request for relief from this court is to not only reverse the district court's judgment, but to remand with directions, specific directions to adjudicate all remaining claims. As this court knows, this is the second time this case has been before this court. And for the sake of efficiency and conserving judicial resources, we would ask that the remainder of Mr. Bradford's claims be adjudicated. And if there are no further questions, Your Honor, I will reserve my the remainder of my time for rebuttal. Thank you. That's right. Counsel for you have 30 minutes allotted. So, again, if you'd like to make a rebuttal, you don't you won't make a rebuttal. So you can regale us for 30 minutes. Thank you, Your Honor. If it may please the court, Katherine Farkas on behalf of petitioner Mark Bradford. As Judge Smith indicated, the jury was presented with the concept of intoxication. The evidence, however, was woefully insufficient. In the prosecutor's guilt-based closing, she argued, quote, We know the defendant had something to drink, but there is no evidence whatsoever that he was intoxicated. Well, that may be the prosecutor. But Mr. Cohen was pretty fulsome about his presentation, right? About how much intoxication was involved. No, Your Honor. And the ineffective assistance of counsel goes to both the defense counsel's failure to obtain the BAC results, which would have been objective scientific evidence, the amount of intoxication and the. OK, let's let's work it through here. I'm a member of the jury. OK, and you make your claim. You've got the doctor that talks about extrapolating. You've got arguably three different levels of intoxication, which would have been fatal. The the least fatal one of four, whatever it was. It's all speculation. The the sample was taken 13 hours later than the event occurred. Who knows what he would have had in his system at that point? So it's all speculation. But the concept of intoxication was there. But then you have all these confessions, especially the fourth one, where he talked very specifically about what he intended to do, why he intended to do it. He had the strangulation, which, as we discussed, is, per se, premeditating. I understand you've got a tough burden. You're a good lawyer. You work with this stuff. But we're talking about AEDPA here. AEDPA is highly deferential. And what we have to find out is whether the California Supreme Court was just unreasonable in finding that it could have been the way that the state trial court found it. And I'm struggling with that. So help me. You know, don't just say intoxication. The jury heard that. Tell me why what you're talking about satisfies AEDPA. And the parties agreed to hold off on arguing on any briefing as to whether Loper-Bright modifies AEDPA. Okay, let's take Loper-Bright. You're not really serious about that, right? It is an issue that is currently being briefed in multiple cases in this court. You have three pages in your brief on that. And then you say, if the panel is interested in this, we request supplemental briefing. You don't get to ask and take by right supplemental briefing. You were given a brief. You were given pages. You made the argument in the three pages. And you don't get to ask for more. Understood, Your Honor. I will address why AEDPA, as it is currently interpreted in this court. Let's assume for our discussion that Loper-Bright doesn't help you.  And the answer, Your Honor, it's important that we disaggregate. Much of the state's argument was focused on intent. But the issue here is the difference between second-degree murder and first-degree murder. Intent is required for both. To prove to establish first-degree murder in this case, unlike Hernandez, which that was a felony murder conviction.  In this case requires separate elements of premeditation, deliberation, and intent. And the area where perhaps the intoxication and specifically the severe intoxication that existed but was not presented to the jury. Well, that's what you say. But, again, what's different here is you've got all these confessions. Where he indicated, you know, well, I did all this to her. But I don't think she's dead. I want to kill her. Forty-five minutes later, he goes back and he strangles her. He stabs her. He brings that special knife and stabs her in the heart. This is premeditated stuff. Unless you can show me by scientific evidence, he couldn't have thought that. And I'm struggling with that because, at best, the doctor's testimony is speculation. And in his best circumstances, he's got something that even he concedes that he probably would have been dead because of the intoxication. It just doesn't add up to me. And if it doesn't add up under AEDPA, we have to tip our cap to the California Supreme Court, don't we? Let me take the question in this order. First, let me discuss why premeditation and deliberation are different elements and deliberation is the one most impacted. And then let me return to the fact that Dr. Cota's declaration is not speculation. It's not speculation? Yes, Your Honor. And why do you say that? The reason that the defense is now in the position, Mr. Bradford's in the position, of having used the only scientific method available, which is to take the quantity of alcohol that Mr. Bradford consumed and calculate what his blood alcohol was based on a conservative estimate. But again, that's an estimate. It's an estimate, yes, Your Honor. And if I understand correctly, there's no evidence that shows that the prosecution intentionally failed to do the right test or intentionally failed to deliver whatever the test would have been to the defense. Is that correct? That is incorrect, Your Honor. It is incorrect. So perhaps I'll start with that in return for the other questions. There is not only the evidence. As we all know, the reason that blood testing facilities even exist to be done in a police station at 6.30 in the morning is blood alcohol. The officers who interrogated Mr. Bradford first discussed his intoxication, described the fact they believed his intoxication had a role in the crime. They then threw his blood into that vacutainer containing the solution for toxicology testing. And afterwards, in the next interrogation outside of Edwards, Detective Hooks said the amount you drank will be considered in determining whether it was first- or second-degree murder. And what? Of course. That's tautology. I mean, that doesn't tell him anything. That tells you that the police were well aware that the amount that Mr. Bradford drank. Of course they were. They're police. They know about the elements of a crime. But that doesn't tell us that the prosecutor or the state intentionally failed to deliver something that they knew was inculpatory to them to the defense. The idea that he would say that intoxication plays a role in proving the elements of a crime, that doesn't tell me anything. Brady does not have an intent element. But in any case, here, to the extent you need to understand what they were thinking, they both understood the exculpatory nature, as Detective Hooks said, and they understood Mr. Bradford was intoxicated. But what establishes that a BAC test was, in fact, done? Because that critical allegation in the state habeas petition was alleged on information and belief. Why aren't we obligated under Richter to consider whether the California Supreme Court reasonably concluded that that allegation was insufficiently supported factually? The only reason we do not know whether a blood alcohol test was done is the state has refused to answer the question. States often attach exhibits to informal briefings. Certainly when this case returned to the district court, it would be another opportunity under Coleman prejudice for fact development. Just looking at what the California Supreme Court did under AEDPA, and there you filed something and the state didn't respond, and so whether or not the state could have said something is not really relevant. What's relevant is four corners of what the California Supreme Court reviewed and what you put in front of them. What, in terms of what was put in front of them, establishes that the BAC was done and makes it unreasonable for them to have concluded, perhaps, that it was not, that that had not been established that it was done? Your Honor, the evidence of Mr. Bradford's BAC existed as soon as his blood was drawn into the Greystopper vial. That vial contained evidence of Mr. Bradford's BAC. So the only two plausible alternatives suggested by the state— And that information was never provided to the defense? The blood was never made available. As the state says, it was used up for blood testing. I understand, but what they had, they gave it to you, right? We don't—the state has never said that's the case. Okay. Well, we know that serology testing was done, and we know from the cross-examination by Mr. Cohen that he clearly seemed to be aware of both the serology results and then there was also at the same time some kind of saliva testing that was done. So he was aware of those. But what establishes that a BAC test was done? Now, your first answer was that it doesn't matter whether a BAC test was done. But is there—how was it established in the state habeas petition that the BAC test was done? To the extent that the state court concluded that it was not done, that would be unreasonable fact-finding because it would have done without— Why is that unreasonable from this record? Because unreasonable to conclude that without the state averring one way or another whether the testing was done for the California state court to conclude without a hearing, without a response from the state, that the test was not done would be unreasonable fact-finding under Taylor v. Maddox. But with respect, counsel, I think you've done what the district judge did here. You're doing this de novo, trying it as the original trier of fact. That's not what we do. We have the state trial court. Then we have the California Courts of Appeal, the California Supreme Court. And the question is whether it was unreasonable for the California Supreme Court to have concluded that it was okay what was done, right? Yes, Your Honor. That's under AEDPA. And because the only two alternatives that are suggested by the evidence in any way are that either the blood alcohol was done, the prosecutor, as she said, standard tests were done, and we know standard testing of a gray-stoppered vial includes toxicology. Either the test was done but never provided. It was not in trial counsel's vial, and neither side believed it. Let's say it was. I mean, again, you're doing a good job. You have to do what you have to do. But we get hammered by the Supreme Court for failure to follow AEDPA. And what we're dealing with here is, you know, you might have done it differently as a trial judge. You might have been doing something different as the California Supreme Court. But the fact that something wasn't provided, because I thought it was provided, but the reality is it may have been the wrong test. But the fact is it is reasonable, is it not, for the California Supreme Court to have said, yeah, that's okay. And if they say that, how can we overturn that? It is not reasonable to engage in fact-finding without evidence, without affording Mr. Bradford an ability to get an answer to the question the state won't answer, which is what was the BAC, and if the LAP does not have it, why not? But the facts we know are that, taken from what's in the materials, that it was supposed to be a DNA test. It was, in fact, drawn into a vial that had the solution for BAC, and serology results were done. That's what we have. Those are the facts that we know. How does that add up to a BAC test was done? I would ask that you carefully review the transcript of the communications with the district attorney. While it is a little bit confusing, she does not say that it was drawn for DNA testing. She does refer to a purple vial. She said the instruction was to use a purple vial, and under your own materials, the purple vial means DNA testing. And had an appropriate fact-finding occurred in the state court, questions uniquely known to the state would be available to this court, including what instruction. Who gave an instruction to use a purple vial? But the California Supreme Court is entitled, and under Richter, we have to look at what arguments they could reasonably have read to reach the conclusion, and one argument is that factually you didn't support the allegation that a BAC test was done. And if they reached that conclusion, would that have been reasonable? And given the bare facts here, getting to a BAC having been done is speculative, and you recognized it because it was pleaded on information and belief because it wasn't enough. Even under Richter, even under AEDPA, the California Supreme Court has to engage in a reasonable fact-finding process. In this case, there's no case where there's... And who determines that under AEDPA? Do we as a panel have the ability to say, you know, if I had gone to the California Supreme Court, I would have decided it differently. Or do we get to say, with fair-minded jurists and so on, could they have, looking at this evidence, concluded to what they did? We have to look at what the California Supreme Court did and whether it is a reasonable application of Brady and Strickland and whether it is a reasonable application, a reasonable fact-finding. In this case, a Brady claim inherently refers to suppression of evidence. Mr. Bradford produced all of the evidence available to him, and it strongly indicates that there was... Well, we know there was BAC evidence because it was in the vial. It was either used... Can I ask you a factual question on that? Because you said, I think, a few minutes ago that it was used up. So... But I thought there was some sample that was destroyed in 1993. Is that the same gray-stopper one that survived? And it was... So did some of it remain all the way to 1993? Some of it was used for testing, and some remained that would have been available? What does the record show on that? The record does not. Again, information uniquely available to the state that they choose not to provide to this Court or to Mr. Bradford. But the answer, Your Honor, is that the prosecutor's statements, when she was requesting additional blood, seemed to indicate that the blood was consumed for testing. We do also have the sheet showing destruction... What statement is that? Is that the statement at the hearing to get a second DNA? Yes, Your Honor. Okay. Suggests that she needs additional blood, not just because of the color of the vial, but because the blood was consumed. On the other hand, we do also know that the state improperly destroyed the vial. So we don't have a way. It's uniquely known to the state, much like its own post-conviction... But if it was used up in the testing, then how was any evidence destroyed in 1993? Again, we just don't know how much blood remained in that vial at the time. But if there was blood that remained and it was sufficient to do a toxicology test at that time, given the preservation and assuming proper storage, that would have been additional blood destroyed in 1993. It just strikes me. I mean, again, you have a job to do, and I understand that. But the test was taken 13 hours later. Whatever alcohol there was in the blood would have been hugely dissipated by then. You've got the testimony of his friend. You've got his own views. But the concept of intoxication lowering the premeditation factor was presented to the jury. They knew that he claimed to be intoxicated, hugely intoxicated, and yet they didn't buy it. How does that factor into our decision? Thank you. I did want to return to the difference between second and first degree. The instructions provided to the jury regarding second-degree murder, and this is the instruction. This was the strategy that trial counsel used. As you know, he simply inadequately presented it in part because he had no BAC. But he did ask the jury to consider Mr. Bradford's intoxication when it considered the instruction. And the instruction is that a mere unconsidered and rash impulse, even though it include an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree. So the jury was charged with comparing that instruction to the one on deliberation. And deliberation requires that the killing be, quote, a result of careful thought and weighing of considerations for and against the proposed course of action. So it wasn't merely finding intent to kill. It wasn't merely finding premeditation, that he thought about it in some way beforehand. But the jury had to weigh the difference between a rash impulse and careful thought and the weighing of considerations for and against. And they had the fourth, if you will, confession, in which he carefully said after 45 minutes, you know, this woman's not dead yet. Is she going to rat on me? I'm going to go down and finish her off. So he takes a butcher knife, serrated butcher knife. He takes something to strangle her with. He goes down there. She's gurgling in her own blood. He strangles her. And then he stabs her in the heart several times. All of this 45 minutes later, the jury had all that. So whatever the blood test might have shown, in effect, haven't they already taken into account? They would have assigned whatever they did to the intoxication element, but they overrode it based upon the fourth, if you will, confession. No, Your Honor. They simply did not have that evidence of intoxication. The prosecutor was able to argue twice that there was no evidence Mr. Bradford was feeling anything from what he was drunk. But he said so. Let's say he says, you know, the four-point whatever. I was that intoxicated. I was just out of my mind. And then he has his confession, and the jury weighs the two and says, you know, I don't think so. But that's not what happened. The jury did not have information on the intoxication. They did not have testimony from Peg MacHorrison, who saw him huddled under a blanket in the hallway slurring his words, seeming high. They did not have testimony about the effect of intoxication. They certainly did not have the testimony we have from Dr. Foster and Dr. Marikangas about the combined effect of Mr. Bradford's preexisting brain damage from when he fell from a moving truck as a child and the combined effect of that on the severe intoxication they had here. They neither knew about the brain damage nor the severity of the intoxication when they weighed. And they had instruction to resolve doubts between first- and second-degree murder in favor of returning a verdict of second-degree murder. So if they were convinced it was a rash impulse, they had to return a verdict of second-degree murder. If even one juror had a reasonable doubt as to first-degree murder, that would have been a more favorable outcome in this case, and there would be prejudice and immateriality. How does that cut? Is that cut in favor or against your position? If, Your Honor— I'm not sure it helps you. Of course it does. The burden was with the prosecution. Right. And if one juror considered the amount of intoxication— and intoxication is something that no doubt some of the jurors were familiar with. Oh, sure. And they understood that people sometimes act under a rash impulse when intoxicated. And the parts of the confession that you point to, we look at the fourth confession after Mr. Bradford was finally sober, but I think it's important to understand the district court correctly found that aspects of the confession were suggested to Mr. Bradford, and he did adopt them. He didn't remember putting something around her neck or what it was. So there's no testimony about him bringing that. But—and that's all true. But Judge Hatter had all that information, but so did the California Supreme Court. And the California Supreme Court, weighing it all together, concluded that it was a reasonable decision on the part of the jury and the trial court, right? The—it is hard to understand what their fact-finding was, given the summary denial, but it was unreasonable to conclude. And again, then we get back to EPPA again. You want to convince us, like you convinced Judge Hatter, that we can de novo look at this and say, well, I don't know whether we would agree with that. But that's not the standard. It's not the standard. And under EPPA, as I said, the Supreme Court repeatedly tells us what was before the California Supreme Court in this case was a reasonable decision. Could they find it? And they did. There's no case holding in a Brady claim that a summary denial, essentially denial of the claim without giving the defendant an ability for fact-finding, allows—prevents the federal court from addressing the claim without— again, without fact-finding, where the state continues to suppress the evidence. The state will not answer the question of what his BAC is, and it may be in their possession because we have never been afforded fact-finding on this issue. You speculate they have that, but you have no proof of it, right? It's the nature of suppression that we—Mr. Bradford has presented evidence available to him. But, yes, to the blood alcohol result, to the extent there's a paper that was suppressed, he has no way to prevent that. From your perspective, the negative pregnant is what helps you. Well, it doesn't just help—it hurts in that the case was summarily denied and no one has afforded Mr. Bradford fact-finding. And the state does not deny that it has a BAC result. And so that— You asked him and they said, we've got it? We have not been afforded an opportunity. I didn't know any of that. In briefing over and over, and we point to it in the papers, in the post-remand briefing, extremely clearly, the brief said that this claim could be decided on the evidence presented by Mr. Bradford or they could have a hearing. We have always invited a hearing. And specifically the briefing says that the state refuses to state what the BAC was or ever that it never existed. And the state responds to that with silence. So, yes, we have absolutely asked for— The negative pregnant is if you ask it and they don't answer it, then they must be admitting it. I'm not saying they must be, but I'm saying that to deny a Brady claim in a way that just permits the state to continue suppressing is to misapply Brady. And to be clear, the state has supplemented the record with other information. In fact, as you know, the recordings of the confessions were not in the record. So there are declarations from this, the request for judicial notice in this case and in the previous case before the judge, before this court. The assigned deputy attorney general sent an email to the LAPD and said, could I get a copy of those recordings? She got one, and she presented it at the court. There are many, many cases in which—  To this court. The request for judicial notice in this case, and it's even more detailed in the last— But did the State court have copies of those recordings? The recordings themselves, I do not know. There was—I do not know whether the recordings—the fourth recording was played to the jury. The—I do not know from the record. I do not see that the State had the other three recordings. And that's, of course, what we're looking at. What did the State trial court have? Yes, I understand, but what I'm saying, too, in terms of suppression, we don't look just to what the State trial court had. And we also, in terms of deficient performance by trial counsel, of course, trial counsel also failed to obtain that PAC, failed to call the witnesses that would have testified persuasively, who would have supported the argument, which is that this was a rash impulse and not the result of careful thought and weighing of considerations for and against a proposed course of action. Counsel, I have a question for you, if I may, please. And I'll give you an extra minute or two if you need it, because I'm using up some of your remaining time. So does your client have the burden of proving that suppressed evidence was, in fact, favorable? Your Honor, one of the elements of Brady is certainly that the evidence be exculpatory. Right, so that's your client's burden, correct? Yes, Your Honor. So what is the evidence that you point to in the record that shows that whatever was suppressed was favorable to your client? I would point to Mr. Bierman's statements, all of them, starting with the first statement to the police shortly after the crime where he described that Mr. Bradford was drinking whiskey and beer all day. And all of his statements, including the trial testimony, which he gave after being rattled by the prosecutor, in his trial testimony, even then, he describes an amount of alcohol that would not have been fully metabolized by the time of the blood draw at 6.30 in the morning. And certainly, Dr. Cote, there's never been anything that the state has pointed to that was erroneous about Dr. Cote's methodology. I understand the numbers are high. Mr. Bradford... I mean, do you agree that the two scenarios are essentially implausible? He'd be dead under those scenarios. No, Your Honor. At .9? Who would be alive at .9? There have been cases that were... We don't argue that the .9 is correct. We have argued that the court should accept the low end, which is the most conservative estimate, and presumably Mr. Bradford, who was an alcoholic for a long time, began drinking at age 15 and by 25 was a long-term alcoholic. Certainly we understand that Dr. Cote was correct to use a high end of metabolization, but there is no evidence that is inconsistent with Dr. Cote's low end estimate. And the blood, any amount of, as you pointed out, a .227 was well above the amount that's detectable. There is no question here. There can be no reasonable doubt that that blood, when it was preserved for toxicology testing, was exculpatory to Mr. Bradford. Can I ask you a question about, suppose hypothetically we were to reverse the grant of relief on the grounds provided by the district court. What is left for remand? Just the sentencing issues at that point? There are other ineffective assistance of counsel claims in this case that the... I know he wrote in the judgment that C and G are dismissed as moot, but I don't see that they survived the first appeal. He dismissed all of eight in the prior case, and then that went up on appeal. And what was argued was essentially the portions of eight that we now have. Everything else was gone. It's not in that opening brief. So I don't see how it was remanded. So it seems to me there's nothing left on the merits other than what he granted relief on, and then the sentencing issues just have to go back because they were never addressed. Yes. Am I wrong on that? Was there a claim where H, C, and G argued in the first appeal? First of all, I want to say that I was not counsel on the case, so I don't know the subclaims by heart, and I apologize for that, Your Honor. But I do believe that any issues that were not addressed by the court would need to be remanded, certainly the sentencing issues. He dismissed the entirety of eight when it went up on the first appeal, and then the arguments for reversal were limited, and they seemed to just abandon C through G, and so it only went back on the rest. And now he seemed to think it was still live, but tell me if I'm reading the record wrong. My belief, and again I apologize because I was not on the case, but the dismissal initially was for procedural bar. So while the argument focused on these claims when it came up before, the reason it went back, it was remanded, was that the Coleman cause was established. And so I believe that would apply to all of the claims that Judge Hatter dismissed for procedural bar. And I realize that I'm out of time. Thank you. If there are no further questions, Petitioner secedes. Thank you very much. Hearing no questions from my colleagues, we'll turn to appellants. So, Your Honor, we have, I just want to make it very clear, there is nothing in the record that shows that a BAC report was ever done in this case. The state has never evaded that question. The burden is on Mr. Bradford to show that such a report was completed and it was favorable, but it is our ethical duty to disclose evidence that is in our possession, and we have all of the information that we have, the allegations in this case, the record in this case, our conversations that we've had with the prosecution, establishes that no such BAC report exists. So from your perspective, that's just off the table. There's no evidence that you have it. You haven't denied it, but just it's not there. Right. And, Your Honor, we haven't gotten to a stage where, you know, we can litigate and investigate further and see exactly what happened. With the limited information that we have and what we've seen, we certainly wouldn't be continuing to represent to this court that no such BAC report was ever done if we actually had information to the contrary. So I just want to make that very clear. What's your answer to this issue about the ambiguity of the sample that was taken? Because the sample is taken and then everyone agrees that something related to that sample was destroyed in 1993, but there seems to be an inference, if not a statement, that it was used up and therefore there had to be another draw in that hearing. What was destroyed? Was there anything left to be destroyed? So I don't, the answer to that question is I don't know. I will say that when the evidence was destroyed in this case, it wasn't just the vial of blood. It was all of the evidence. That's my understanding of it. It wasn't just that this particular vial somehow got singled out and got mistakenly destroyed. It was that the items in possession of LAPD were mistakenly destroyed. So anything that they had related to this case. That's my understanding based on the declaration of the investigator that Mr. Bradford has submitted and his discussion with one of the investigating detectives in this case. I don't know if there was enough blood left in it to still test. That's correct, Your Honor. And I will say that the bulletin that Mr. Bradford has submitted in support of his claim says that if you're doing DNA testing, you must draw two vials of blood. One with a purple stopper and one with a yellow because there needs to be a reference sample as well as the sample that's analyzed for DNA or control, I believe. So I want to correct something that Judge Smith said earlier. I don't believe that Mr. Bradford took a belt from his apartment. I believe that that was something that was in Ms. Cokes' apartment. But he certainly armed himself with a knife prior to returning to her apartment. As far as fact-finding here, there's been no unreasonable fact-finding because this is a summary denial. And so everything is analyzed under D1. So as I've stated— Oh, what about—I mean, I think one of the central issues we're grappling with is what the California Supreme Court did with the set of facts it had about whether a BAC test was done. And one possible thing it could have done was to say that this collection of facts does not add up as a matter of California law to a sufficient allegation that the BAC test exists. That issue—everyone agrees we would review that for reasonableness, but is that reasonableness under D1 or D2 or does it matter? I think it's all under D1 because it is a silent denial. Oops, D2-ish. Well, we would be speculating about the facts, right? But ultimately, Brady materiality or any steps of Brady, I think, would be D1 in the face of a silent record. However, it doesn't really matter how this court does it. I just want to emphasize that if there's a silent denial, necessarily no fact—we don't know what fact-finding. There was no fact-finding done. But under D1, the court could have reasonably determined that materiality wasn't shown because assuming the existence of a favorable BAC report, assuming that BAC report was .497, that in no way would establish materiality because the evidence of his premeditation and deliberation was undeniable in this case. And the jury—Mr. Bradford's counsel said the jury was instructed about premeditation and deliberation. Bradford weighed and considered the question of killing. We know that because he told us. He was in his apartment. He thought about it. She could still be alive, so I better make sure she's dead so that she does not identify me. So that was squarely established. And again, no fact-finding is necessary here because the absence of evidence does not equal relief, especially when we're looking at deficient and ineffective assistance of counsel. The Supreme Court in Dunn v. Reeves said the absence of evidence, namely here we have no declaration from counsel shedding light on anything that he might have done here. Why he chose to save Dr. Thompson for the penalty phrase versus the guilt phase. Whether he sought to independently test the vial of blood that he knew existed for BAC. We have none of that, and because of that, the deficient performance prong is not met because the presumption is that counsel acted strategically here. In the face of absence of evidence, we can't say that he acted, that his performance was deficient. Regardless, again, I'm sorry. I want to revisit one thing I asked you about before, and that is about claims A, C, through G. Yes. I think before you thought that should go back, my colleague has raised the question with Mr. Bradford's counsel. They, I think they said it should, but I'm not sure. What's your position? So my position, Your Honor, and I apologize too because I don't have as much clarity as I should because I wasn't counsel on the first case either. However, I believe that the entirety of claim A was up on appeal on the procedural bar, and then the entirety of claim A was remanded and for the district court to consider whether prejudice had been established within the meaning of Coleman. And so Judge Hatter dismissed the remainder of the subclaims in claim A as moot. And then, of course, there are other claims that had previously been, I guess, they haven't even been briefed as my understanding. There's a set of claims. What Judge Hatter didn't deal with because of the result he came to, that's still pending. Is that right? Correct. Correct, Your Honor. And I see that I'm over my time. I would just really like to wrap up briefly. The State did lodge the taped confessions here. It's clear that Mr. Bradford, even in the 5 a.m. confession that wasn't admitted into evidence, is lucid. He's not confused. He's speaking clearly with the detectives. And there's no evidence whatsoever to show that he was intoxicated to the point that his premeditation and deliberation would have been negated by the alcohol that he drank that day. So the State respectfully requests that the District Court judgment be reversed. And as previously mentioned, this Court remanded the matter with directions to adjudicate all remaining claims. Thank you, Counsel. Thank you, Your Honors. I want to thank counsel on both sides of the case for their excellent advocacy today. But we couldn't decide these difficult cases without help from the advocates, so we thank you. This case shall now be submitted, and the parties will hear from us in due course.
judges: GOULD, SMITH, COLLINS